2006 OK 66

Bill BURGESS and Betty Burgess, Plaintiffs/Appellees,

and

Gary Sadeghy, Intervenor/Plaintiff/Appellee

v.

FARMERS INSURANCE COMPANY, INC. Farmers Insurance Exchange, Farmers Insurance Group of Companies and Farmers Group, Inc., Defendants/Appellants.

No. 99,739.

Supreme Court of Oklahoma.

Sept. 19, 2006.

Reggie N. Whitten, Michael W. Hinkle, Jason E. Roselius, Derrick L. Morton of Whitten, Nelson, McGuire, Terry & Roselius, Oklahoma City, OK, for Plaintiffs/Appellees, Bill Burgess and Betty Burgess and Intervenor/Plaintiff/Appellee, Gary Sadeghy.

. Richard C. Ford, LeAnne Burnett, Rustin J. Strubhar of Crowe & Dunlevy, Oklahoma City, OK, for Defendants/Appellants, Farmers Insurance Company, Inc., Farmers Insurance Exchange, Farmers Insurance Group of Companies and Farmers Group, Inc.

LAVENDER, J.

¶1 Insureds seek compensatory and punitive damages in this case for breach of contract, bad faith, fraud and deceit arising from Insurer's alleged systematic failure to pay Insureds amounts due for general contractor's overhead and profit (hereinafter "O & P") and for Insurer's alleged intentional withholding of information concerning the Insured's entitlement to the O & P payment at the time of Insurer's actual cash value (hereinafter "ACV") settlement. The contested issues in this litigation concern the circumstances giving rise to the Insureds' entitlement to payment for O & P, timing of the O & P payment, and the nature and extent of Insurer's duty to disclose (and documentation of such disclosure) to its Insureds during the claim settlement process concerning the Insured's right to an O & P payment (and/or the reasons for not paying in any particular circumstance). At the heart of this controversy is Insureds' allegation that there is an

industry standard "three trade rule," which dictates that upon a determination that three trades are implicated in the repair of property, then a general contractor is presumed to be needed to coordinate, supervise and oversee the repair and thus, a 20 per cent O & P payment is included in the calculation of the ACV settlement. Insurer denies the existence of a rigid "three trade rule" and argues that such rule, if applied, would impermissibly result in expansion of Insurer's contractual obligations. Insurer asserts that instead of following such a rule, Insurer's adjusters use complete individual discretion and follow a "common sense" approach to determine whether the property damage in each individual case requires a general contractor. Thus, Insurer claims it is a case-by-case determination whether to include the 20 per cent O & P payment at the time of the ACV settlement of the claim. While the trial court expressly avoided reaching any determination on the merits, it examined the "three trade rule" solely for the purpose of identifying the class (class members included only those claimants with claim files reflecting that the involvement of three or more trades was anticipated in the property repair at the time of ACV adjustment). The trial court determined all the requisite elements of 12 O.S. § 2023 were met and defined the class as follows:

All Oklahoma citizens who were or are Farmers homeowners' policyholders who:

(1) suffered a covered loss to their home from June 14, 1994 to the present;

(2) whose loss was adjusted on an actual cash value (ACV) basis;

(3) whose claim files indicate the anticipated involvement of three trades or more

in the repair of the property at the time of the ACV adjustment; and

(4) whose ACV adjustment did not include a 20% payment for O & P.

Insurer filed this interlocutory appeal pursuant to 12 O.S. § 993(A)(6). The COCA reversed upon a finding that the trial court abused its discretion because the "record reveals there is great discretion invested in the expertise of the adjuster when determining whether to invoke the general contractor's O & P. Farmers had no standardized rule." COCA Opinion at ¶ 9. In distinguishing this case from *Melot v. Oklahoma Farm Bureau Mutual Ins. Co.,* 2004 OK CIV APP 25, 87 P.3d 644, *cert. denied,* the COCA in this case concluded that individualized assessments of each homeowner's property damage situation predominated over common questions to the class and precluded class certification. To the extent the COCA's conclusion as to class certification was based at least in part upon determinations on the merits of the action, we disagree with the COCA and reject those merit-based determinations. Inquiries into the merits are inappropriate for consideration of whether a class should be certified. *Black Hawk Oil Co. v. Exxon Corp.,* 1998 OK 70, ¶ 18, 969 P.2d 337, 343 (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). Further, we find there is sufficient evidence in the record that there are common questions of law or fact that the Insureds' claims are typical of those of the class as a whole to support the trial court's finding of the prerequisites to class certification pursuant to 12 O.S. § 2023, and particularly § 2023(B)(3), which is specifically challenged on appeal.[1] Therefore, the

---

1. 12 O.S. § 2023 provides in pertinent part as follows:

A. PREREQUISITES TO A CLASS ACTION. One or more members of a class may sue or be sued as representative parties on behalf of all only if

1. The class is so numerous that joinder of all members is impracticable;

2. There are questions of law or fact common to the class;

3. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4. The representative parties will fairly and adequately protect the interests of the class.

B. CLASS ACTIONS MAINTAINABLE. An action may be maintained as a class action if the prerequisites of subsection A of this section are satisfied and in addition:

1. The prosecution of separate actions by or against individual members of the class would create a risk of:

a. inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

b. adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or sub-

trial court did not abuse its discretion in certifying a class in this case.

## I

## FACTS AND PROCEDURAL HISTORY

¶2 The insurance policy at issue in this case contemplates two types of claim settlements: (1) the actual cash value (ACV) and (2) replacement cost. The policy expressly permits, at the option of the Insured, a claim for ACV with no mandate that the Insured actually repair the property. The insurance policy is silent on the issue of general contractor's O & P, but the parties agree that under certain circumstances, O & P payments are to be paid at the time of the ACV settlement.[2] The loss settlement provision of the Insureds' homeowner's insurance policy provides as follows:

Covered loss to Buildings under Coverage A and B will be settled at replacement cost without deduction for depreciation, subject to the following methods:

(1) Settlement under replacement cost will not be more than the *smallest* of the following:

(a) the replacement cost of that part of the building damaged for equivalent construction and use on the same premises.

(b) the amount actually and necessarily spent to repair or replace the building intended for the same occupancy and use.

(2) When the cost to repair or replace is *more* than $1,000 or *more* than 5% of the limit of insurance in this policy on the damaged or destroyed building, whichever is less, we will pay no more than the actual cash value of the damage *until* repair or replacement is completed.

(3) **At your option, you may make a claim under this policy on an actual cash value basis for loss or damage to buildings.** Within 180 days after loss you **may** make a claim for any additional amount on a replacement cost basis if the property has been repaired or replaced.[3]

stantially impair or impede their ability to protect their interests; or

2. The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

3. The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

a. the interest of members of the class in individually controlling the prosecution or defense of separate actions,

b. the extent and nature of any litigation concerning the controversy already commenced by or against members of the class,

c. the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and

d. the difficulties likely to be encountered in the management of a class action.

**2.** There is conflicting evidence in the record on the timing of Insurer's O & P payments when made. Farmers Claim Service Center Manager Kelly Katter testified that O & P payments were not always paid up-front with the ACV settlement in Oklahoma. Testimony of Kelly Katter, Farmers Claims Service Center Manager, Transcript of Hearing of April 8, 2003, Vol. II, p. 259. Other Insurer's employees testified the O & P,

when due, was *always* paid up-front with the ACV settlement and such payments were not withheld from Insureds until such time the general contractor expense was incurred. *See* Plaintiffs' Exhibit # 68, Roland E. Senechal February 7, 2002 Depo. Tr., p. 96; Plaintiffs' Exhibit # 64, Kerry Arbuckle February 8, 2002 Depo. Tr., pp. 158–159. Insurer's internal documents revealed a policy to pay O & P up-front on all applicable ACV claims in accordance with a desire for "uniformity throughout our organization." Plaintiff's Exhibit # 13, Memo of April 17, 2001 from Mark Lee, Claims Service Center Manager, to Kelly Katter, Branch Claims Manager. This memo additionally provides "[w]e all agreed as a rule of thumb that we would include O and P on all estimates involving more than three separate trades." Other Insurer's employee testimony and other documentary evidence such as building loss worksheets reveal that Insureds were not paid for general contractor's O & P unless and until they hired a general contractor and submitted receipts to prove they actually incurred the expense. *See* Plaintiffs' Exhibit # 65, Raymond Kyser, Jr. October 30, 2002 Depo. Tr., pp. 96–97 ("If it's not incurred, then we don't owe for it. If it is incurred, then we do owe for it."); John Wright February 13, 2003 Depo. Tr., p. 40 ("usually it's [paid] on an incurred basis"); Plaintiffs' Exhibit # 12, Building Loss Worksheet dated 11/01/01.

**3.** Defendants' Exhibit # 1 to the April 7–10, 2003 Hearing on Plaintiffs' Motion for Class Certification, p. 11 (emphasis added).

### The Burgess claim

¶ 3 Insureds Bill and Betty Burgess suffered a covered loss to their home on or about October 23, 2000 and filed a claim with Insurer. Insurer's adjuster, David McKeown, met with the Insureds, examined the property and produced an estimated cost of repairs, which included the following list of "O & P items": cleaning, general demolition, drywall, framing & rough carpentry, insulation, painting, roofing and wallpaper. Insurer gave Mr. and Mrs. Burgess a check for the ACV payment of their claim, which did not include an allowance for O & P. Insurer's adjuster testified that he did not discuss general contractor's O & P with the Burgess Insureds, nor did the claim file contain any documentation concerning a general contractor's O & P.[4] Mr. Burgess testified he was unaware of O & P, what it was and under what circumstances he might be entitled to O & P payment.[5] Insurer's adjuster testified he handled the Burgess claim in a typical fashion that he handled all homeowner property claims.[6]

¶ 4 After receiving their ACV payment, the Burgess Insureds chose to repair their property and submitted supplemental claims for the replacement cost. Mr. Burgess testified he essentially acted as his own general contractor in that he personally located, coordinated and supervised roofing and painting company's repair of his property.[7] Insurer's payment of supplemental claims did not include a 20 per cent payment for general contractor's O & P.[8]

### The Sadeghy claims

¶ 5 Insured Gary Sadeghy was a residential homebuilder with twenty years involvement in the construction business. Mr. Sadeghy had several properties insured under his policy with Insurer and had a total of three claims.[9] One of these claims arose after Mr. Sadeghy's house was flooded in July, 2000. Insurer's adjuster, Taber Leblanc, met with the Insured, examined the property and produced an estimated cost of repairs, which included the following list of "O & P items": general demolition, floor covering-carpet, finish carpentry/trimwork, painting, wallpaper, and water extraction services. Insurer's adjuster gave Mr. Sadeghy a check in payment of his claim, which did not include an allowance for O & P. Insurer's adjuster did not discuss general contractor's O & P with Mr. Sadeghy, nor did the claim file contain any documentation concerning general contractor's O & P. Mr. Sadeghy testified that at the time of this first claim, he was unaware of general contractor's O & P in terms of insurance carrier's payment of such and/or the circumstances under which he might be entitled to O & P payment.

¶ 6 Insurer's adjuster testified he was not trained to explain to insureds what O & P was, when they may be entitled to it and that O & P was not a policy benefit.[10] Insurer's adjuster could not explain why Mr. Sadeghy was paid for general contractor's O & P on his second claim (the December, 2000 claim

---

4. Testimony of David William McKeown, Transcript of Hearing of April 7, 2003, Vol. I, p. 39.

5. Mr. Burgess testified that although at the time of the loss, he did not know anything about general contractor's overhead and profit, he learned about O & P later from his son, who is a lawyer. Testimony of Billy W. Burgess, Transcript of Hearing of April 7, 2003, Vol. I, pp. 16, 26.

6. Testimony of David William McKeown, Transcript of Hearing of April 7, 2003, Vol. I, p. 36.

7. Testimony of Billy W. Burgess, Transcript of Hearing of April 7, 2003, Vol. I, p. 30.

8. The parties agree (and Insurer's own documents and evidence reflecting insurance industry custom and practice reflects) that when general

contractor's O & P is paid, it is generally 20% of the amount of the actual cash value (broken down as 10% attributable to overhead and 10% attributable to profit). Testimony of Kelly Katter, Farmers Claims Service Center Manager, Transcript of Hearing of April 8, 2003, Vol. II, p. 281.

9. The testimony at the class certification hearing and parties' briefs concentrate on two of the three claims. The two claims pertinent to this matter are from losses incurred to Mr. Sadeghy's home in July, 2000 and a loss to a rental property in December, 2000. Both losses were caused by interior flood damage originating from a bathroom—an overflowing toilet and a pipe freeze/burst respectively.

10. Testimony of Taber LeBlanc, Transcript of Hearing of April 7, 2003, Vol. I, pp. 169–171.

discussed below) and not the July, 2000 claim.[11] Insurer's adjuster testified he handled the Sadeghy claim in a typical fashion that he handled claims every day.[12] Insurer asserts and Mr. Sadeghy concedes that although he received no money in relation to his work as a general contractor, Mr. Sadeghy ultimately received enough money from Insurer to complete the repairs in relation to the July, 2000 loss via his submissions of supplemental claims with receipts for repair costs.[13]

¶ 7 Mr. Sadeghy's second claim arose from damage to a rental property in December, 2000. Insurance Adjuster, John Wright,[14] met with the Insured, examined the property and produced an estimated cost of repairs, which included the following list of "O & P items": content manipulation, general demolition, floor covering-carpet, finish carpentry/trimwork, painting, and water extraction services. Mr. Sadeghy testified that the second claim was almost identical to the first claim in terms of the repair work to be done.[15] Although he received no written information concerning O & P or otherwise any information from the adjuster concerning O & P, Mr. Sadeghy specifically requested payment for general contractor's O & P on this claim.[16] Insurer's adjuster gave Mr. Sadeghy a check for the ACV payment of his claim, which included a 20 per cent allowance for general contractor's O & P. Adjuster Wright testified he paid Mr. Sadeghy upfront for general contractor's O & P because "he had already started the work." [17]

¶ 8 Insureds sued Insurer and sought class certification of a class of current and former insureds similarly situated, asserting Insurer's alleged systematic failure to provide payment under its homeowners' insurance policies for general contractor's O & P, which Insureds allege is a policy benefit made for the purpose of assisting Insureds in securing services of a general contractor. After a four-day hearing on Plaintiffs' Motion for Class Certification, the trial court entered its Order Granting Plaintiffs' Motion for Class Certification on August 5, 2003. The trial court's 19–page Order sets forth in detail its determinations concerning Insureds' demonstration that each statutory requisite for class certification has been met and additionally set forth a class definition, which reflects the trial court's findings. Insurer appealed, principally arguing that individual issues predominated over common issues. The COCA reversed, noting, among other things, that "this Court finds that certifying a class action would impermissibly allow the rewriting *en*

11. Testimony of Taber LeBlanc, Transcript of Hearing of April 7, 2003, Vol. I, p. 197.

12. Testimony of Taber LeBlanc, Transcript of Hearing of April 7, 2003, Vol. I, p. 199.

13. Testimony of Gary Sadeghy, Transcript of Hearing of April 7, 2003, Vol. I, p. 129.

14. Insurance Adjuster John Wright was an employee of NCA Group, which is a national catastrophe adjustment service, hired by Insurer as an independent adjuster to adjust claims on Insurer's behalf. Plaintiffs' Exhibit # 62, John Wright February 13, 2003 Depo. Tr., p. 17.

15. Testimony of Gary Sadeghy, Transcript of Hearing of April 7, 2003, Vol. I, pp. 119–20. Claim documents from both claims reveal different amounts for loss valuation. Regarding Mr. Sadeghy's July, 2000 claim, the subtotal amount is listed at $3,616.16 less the $1,000 deductible for a total of $2,616.16. Plaintiffs' Exhibit # 17, Farmers Insurance Group of Companies/Western Oklahoma Property claim documents regarding July, 2000 loss. On Mr. Sadeghy's December, 2000 claim for which he requested and received payment for general contractor's O & P, his total ACV amount listed in Insurer's claim documents is $10,307.22, to which sales tax and overhead and profit amounts were added (listed separately at 10% each) in the amount of $1,084 respectively, which resulted in a "O & P items subtotal" of $13,008.62. Mr. Sadeghy's $1,000 deductible was subtracted from this amount for a total net claim amount of $12,008.62. Plaintiffs' Exhibit # 35, National Catastrophe Center claim documents regarding Sadeghy loss of December 25, 2000 prepared by claim representative John Wright.

16. Mr. Sadeghy testified that had he not specifically asked the adjuster to include payment for O & P, he "never would have received it." Testimony of Gary Sadeghy, Transcript of Hearing of April 7, 2003, Vol. I, p. 124. Mr. Sadeghy learned about his potential entitlement to insurers' payment of amounts attributable to general contractor's O & P from visiting with other contractors and from the lawyers he hired to represent him in this case. Testimony of Gary Sadeghy at p. 125.

17. Plaintiffs' Exhibit # 62, John Wright February 13, 2003 Depo. Tr., p. 41.

*masse* of insurance policies." COCA Opinion at ¶ 10. Insureds filed a Petition for Writ of Certiorari, arguing the COCA's decision in this case directly conflicts with *Melot v. Oklahoma Farm Bureau Mutual Ins. Co.,* 2004 OK CIV APP 25, 87 P.3d 644, *cert. denied,* which is a decision of another division of the COCA. We entered an Order granting Insureds' Petition for Writ of Certiorari.

## II

### ANALYSIS

 ¶ 9 The standard of review applicable in an appeal of a trial court's certification of a class action is abuse of discretion. *Shores v. First City Bank Corp.,* 1984 OK 67, 689 P.2d 299. "Unless the record before us here indicates that the trial court has abused its discretion, we must affirm its decision to certify a class." *Black Hawk Oil Co. v. Exxon Corp.,* 1998 OK 70, ¶ 10, 969 P.2d 337, 342. Abuse of discretion occurs if the record fails to support the conclusion that each of the five statutory prerequisites for class certification are met. *Ysbrand v. Daimlerchrysler Corp.,* 2003 OK 17, ¶ 5, 81 P.3d 618, 623, *cert. denied,* 542 U.S. 937, 124 S.Ct. 2907, 159 L.Ed.2d 812 (2004); *See supra* note 1. The requirements for certifying a class set forth in 12 O.S. § 2023 mirror those set forth in Rule 23 to the Federal Rules of Civil Procedure, and we may look to federal authority in interpreting our own class certification statute. *Black Hawk Oil Co.,* 1998 OK 70, ¶ 11, 969 P.2d at 342–43. In a close question as to certification, the correct action is to sustain certification because if later developments occur at trial, which demonstrate that the order is ill-advised, the order may be modified prior to a determination on

the merits. *Ysbrand,* 2003 OK 17, ¶ 5, 81 P.3d at 623 (citation omitted).

¶ 10 The first four requirements for maintaining a class action are set forth in subsections 1 through 4 of 12 O.S. § 2023(A), and class members seeking class certification must additionally satisfy one of three alternative requirements listed under § 2023(B) in order to certify a class. The trial court's Order Granting Plaintiffs' Motion for Class Certification sets forth in detail how Insureds have demonstrated each factor, i.e., § 2023(A)(1) numerosity of the class that joinder of all members is impracticable, § 2023(A)(2) commonality of the questions of law or fact to the class, § 2023(A)(3) typicality of the class representatives' claims of the claims of the class, § 2023(A)(4) adequacy of class representatives to "fairly and adequately protect the interests of the class"; and finally, § 2023(B)(3) predominance of common questions of law or fact over individual questions. Insurer's argument on appeal concentrates solely on predominance, and makes no argument or otherwise challenges the trial court's determinations concerning the other statutory requirements.[18] Therefore, our Opinion will address only § 2023(B)(3) predominance of common issues and sub-issues stemming from this category.

### *Predominance of common questions of law or fact*

 ¶ 11 Insureds are required to demonstrate "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." 12 O.S. § 2023(B)(3).[19]

---

18. While Insurer's Petition in Error lists § 2023(A)(4) adequacy of class representatives to "adequately represent the class" as an issue to be raised on appeal, Insurer failed to brief this issue. The trial court's Order included additional determinations on other arguments raised below in addition to the determinations regarding the class action statutory factors, but Insurer does not challenge these determinations on appeal, such as the trial court's rejection of Insurer's statute of limitations defense. Insurer's failure to brief these issues results in waiver of any claim of error in relation to the trial court's disposition of them. *Anderson v. Dyco Petroleum*

*Corp.,* 1989 OK 132, 782 P.2d 1367. Issues not properly preserved for review will not be considered by us on certiorari. Rule 1.180(b) of the Oklahoma Supreme Court Rules, 12 O.S.2001, Ch.15, App. 1; *Hough v. Leonard,* 1993 OK 112, 867 P.2d 438.

19. 12 O.S. § 2023(B)(3) further provides "matters pertinent to the findings include:

a. the interest of members of the class in individually controlling the prosecution or defense of separate actions,

¶ 12 Insureds argue the resolution of a common question-whether Insureds' should make an allowance for O & P at the time of the ACV settlement when three or more trades are anticipated in the repair of Insureds' property-will establish a wrong for each class member. Insureds assert that whether or not the Insured elected to repair the property, the question of whether the Insureds were entitled to payment for O & P applies to every member of the class, which is limited to those whose claim file indicates three or more trades are implicated in the property repair.[20] Insurer contests the validity and existence of a rigid "three trade rule," and argues its adjusters have independent discretion in making individual determinations as to when it is appropriate to pay Insureds a general contractor's O & P. Additionally, Insurer argues that due to the adjuster's individual discretion, the requisite individualized assessment of property damage and individualized determination of ACV in every case, as well as Insurer's potential overpayments to some insureds under certain circumstances (i.e., when Insured chose to repair the property and submitted supplemental claims)[21] would require extensive individual inquiry on each class member's claim, rendering class certification unmanageable and therefore, inappropriate.

¶ 13 The trial court ultimately agreed with Insureds and determined that questions of law or fact common to members of the class predominated over questions affecting only individual members, noting that "the group requesting class certification seeks to remedy a common legal grievance" and that although damage amounts may vary, "the breach of contract, fraud and bad faith claims arise from the same or similar acts or omissions for each Class Member." Additionally, the trial court characterized Insurer's potential overpayments as individual damage calculations, which would not defeat class certification. The trial court determined that class certification is superior to other available methods for fair and efficient adjudication of the controversy, noting that class certification in this case most likely presents the only way class members will learn of their claims against Insurer, since the insurance policy is silent on the issue of O & P and Insureds are not provided any written material concerning general contractor's O & P.

¶ 14 We hold the trial court did not abuse its discretion in its determination that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, as the entire class of Insureds' theory of recovery derives from the allegations that Insurer systematically failed to pay the 20 per cent general contractor's O & P when three or more trades were anticipated in the repair and that Insureds were entitled to information concerning O & P and payment for the O & P amount at the time of ACV settlement regardless of whether subsequent repair costs (if Insured elected to repair the property) included the 20 per cent amount. Insurer would have us reject class certification on the basis of a determination regarding the veracity of its defense on the merits—that Insurer in fact did not operate pursuant to an across-the-board pattern of underpayment of claims, but rather, made individual assessments as to the propriety of O & P payments on every

b. the extent and nature of any litigation concerning the controversy already commenced by or against members of the class,
c. the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and
d. the difficulties likely to be encountered in the management of a class action."
*Id.*

20. Insureds cite cases outside the jurisdiction in support of their argument that class certification here is proper. See *Gilderman v. State Farm Ins. Co.,* 437 Pa.Super. 217, 649 A.2d 941 (class action against insurance company for automatic withholding of 20% representing contractor's overhead and profit from its advance payment);

*Ghoman v. New Hampshire Ins. Co.,* 159 F.Supp.2d 928 (N.D.Tex.2001)(class action against insurance company in which the court granted plaintiff's motion for partial summary judgment, determining the carrier breached the insurance contract by withholding contractor's overhead and profit and sales tax from plaintiff's ACV award).

21. Insurer argues while there may have been claims in which it underpaid for a particular item such as a general contractor's O & P, Insurer may nevertheless have complied with the contract if that underpayment was offset by subsequent overpayment for some other item.

claim. We express no opinion on the merits and our determination on class certification should not be taken as any indication of how a jury might properly decide these fact questions.

¶ 15 The thrust of Insurer's argument on appeal is primarily an attack on the merits, specifically the validity of the "three trade rule," and in support of its argument, raises evidentiary challenges as well as a challenge to the reliability of Insured's expert witness testimony pursuant to the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Christian v. Gray*, 2003 OK 10, 65 P.3d 591 (recognizing a trial court's gatekeeping role regarding reliability determinations as to all expert testimony in Oklahoma civil matters).[22] Despite the fact that the trial court clearly deferred its rulings on Insurer's evidentiary challenges, Insurer nevertheless complains on appeal that the trial court improperly relied upon inadmissible evidence in reaching its class certification determination. These deferred evidentiary rulings are for the trial court to make in furtherance of its "gatekeeping capacity." *Christian v. Gray*, 2003 OK 10, ¶ 9, 65 P.3d 591, 599. To the extent that the trial court considered the parties' respective forecast of evidence at the certification hearing,[23] regardless of the trial court's potential future rulings on the parties' respective evidentiary challenges, the record sufficiently supports the trial court's certification of the class of Insureds in this case.

¶ 16 Further, in recognition of the rule that it is inappropriate to consider the merits of a claim when considering whether a class should be certified, we refrain from ruling on the merits of the alleged "three trade rule," as this is a jury question. See *Black Hawk Oil Co. v. Exxon Corp.*, 1998 OK 70, ¶ 18, 969 P.2d 337, 343 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). For this reason, we disagree with the COCA's merits determination that "Farmers had no standardized rule" as a basis for its conclusion that individualized assessments of each claim would be necessary in order to determine whether Insurer paid the proper amount under the insurance contract. Insurer's assertion that the "three trade rule" is invalid and/or that it did not operate pursuant to an objective standard in the payment of O & P may still be raised (and evidentiary challenges await the trial court's ruling) at a trial on the merits, but it is inappropriate for us to determine its validity at this stage of the proceedings. If Insurer is successful on the merits on this issue and the jury rejects Insureds' assertions as to the Insurer's alleged systematic underpayment of claims and failure to disclose information concerning Insureds' potential entitlement to such payments, then the result will be binding on the entire class of Insureds.

**22.** Insurer devoted much of its argument below and on appeal to its evidentiary challenges pursuant to the "broad evidence rule," asserting that this rule requires individualized determinations as to whether O & P should be part of each repair, and requires consideration of Insurer's post-repair payments to certain Insureds who actually repaired their properties and submitted supplemental claims for additional payment. Insureds argue the only evidence that should be considered is that which was available when the ACV claim was handled because repair history is irrelevant, given the policy language permitting insureds to receive the ACV settlement with no mandate to repair the property. The trial court deferred specific rulings on these evidentiary challenges, but noted Insurer's "right to readjust claims to discover alleged overpayments" presents a common and predominate question of law applicable to all class members. Certification Order at 14. Since the trial court did not make these evidentiary determinations, we will refrain from making determinations in the first instance here. See *Phelps v. Asplund*, 1938 OK 420, 87 P.2d 134. Presumably, as the case proceeds towards a trial on the merits, the trial court will ultimately make determinations on the parties' evidentiary challenges and Insurer's First Motion in Limine, which includes Insurer's *Daubert* challenge to expert witness testimony of Insureds' expert witness, James O'Malley, who testified on the merits issue regarding the existence of a "three trade rule" in the insurance industry.

**23.** During the 4–day class certification hearing, 11 witnesses testified via videotaped deposition testimony. Additionally, the following witnesses testified before the trial court at the hearing: Mr. Billy W. Burgess, David William McKeown, Gary Sadeghy, Taber Wesley LeBlanc, Kelly Katter, James Edward O'Malley, Jr., John Robert Hunter, James Joseph Adrian, and Gilbert Malmgren. Additionally, Plaintiffs offered 77 Exhibits and Defendants offered 74 exhibits into evidence for the trial court's consideration.

¶ 17 As for Insurer's argument that individual issues predominate over questions common to the class, we note that "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Ysbrand v. Daimlerchrysler Corp.*, 2003 OK 17, ¶ 21, 81 P.3d 618, 627, *cert. denied*, 542 U.S. 937, 124 S.Ct. 2907, 159 L.Ed.2d 812 (2004) (citations omitted). Here, the acts or omissions of Insurer which constitute the alleged breaches of contract, bad faith and/or fraud (specifically, Insurer's alleged systematic failure to pay general contractor's O & P at the time of ACV settlement when due and failure to disclose information to Insureds concerning O & P) are the same or similar acts or omissions for each class member. Even though damages amounts may vary, common questions predominate where the acts or omissions are the same. *See Black Hawk Oil Co. v. Exxon Corp.*, 1998 OK 70, ¶ 29, 969 P.2d 337, 345 (noting the mere possibility that plaintiffs' proof on their fraud claims might fail is inappropriate grounds for denial of class certification in case involving alleged standardized misrepresentations to all members of the class); *Lobo Exploration Co. v. Amoco Prod. Co.*, 1999 OK CIV APP 112, ¶ 10, 991 P.2d 1048, 1052, *cert. denied* (Okla. Sup.Ct., Nov. 10, 1999), *cert. denied*, 529 U.S. 1124, 120 S.Ct. 1996, 146 L.Ed.2d 821 (2000);

**The pronouncement in *Melot v. Oklahoma Farm Bureau Mutual Ins. Co.*[24]**

¶ 18 Insureds argued on appeal that the allegations, class definition,[25] facts and circumstances in this case are virtually identical to those in *Melot v. Oklahoma Farm Bureau Mutual Ins. Co.*, 2004 OK CIV APP 25, 87 P.3d 644, *cert. denied*, in which Division No. 4 of the Court of Civil Appeals upheld the District Court of Pottawatomie County's class certification order. In its reversal of the trial court's class certification in the instant case, the COCA distinguished this case from *Melot*, noting that unlike *Melot*, the record in this case "indicates that a decision on overhead and profit is based on an individual assessment of each claim."[26] It appears that the COCA here reached its determination on class certification as well as its determination as to the persuasive affect of *Melot* based upon its improper fact-finding conclusion as to the veracity of Insurer's main defense on the merits of the case, i.e., that Insurer in fact did not follow an across-the-board pattern of underpayment of claims, but rather, its adjusters assessed each claim on an individual basis to determine the propriety of O & P payment. This is the heart of the controversy to be decided by a jury. By distinguishing *Melot*, the COCA essentially simultaneously rejected Insureds' claims on the merits. In doing so, the COCA in this case reached a determination plainly and directly at odds with another published COCA opinion.

¶ 19 *Melot* is correct and to the extent the facts in this case are at any odds with those in *Melot*, it is a distinction without a difference. While Insurer here argues the need for individualized assessment of property loss and adjuster's discretion in determining the propriety of payment of O & P on a case-by-case basis, the insurance carrier in *Melot* similarly argued that its adjusters' took into account all relevant "factors based upon the particular circumstances of a given claim" to determine whether a general contractor was required to coordinate repairs on a property loss.[27] In *Melot*, the COCA specifically not-

---

**24.** 2004 OK CIV APP 25, 87 P.3d 644, *cert. denied*.

**25.** The class in *Melot* was defined as follows: All Oklahoma citizens who were or are Oklahoma Farm Bureau Mutual Insurance Company homeowner policyholders:

1. who suffered a covered loss to their home on or after June 8, 1999
2. whose losses were adjusted on an actual cash value (ACV) or replacement cost (RC) basis;

3. whose Oklahoma Farm Bureau worksheets/estimates indicate the involvement of three trades or more; and
4. whose damage adjustments did not include adequately calculated and timely tendered compensation for general contractor's overhead and profit.

**26.** COCA Opinion at n. 3.

**27.** Opening Brief of Defendant/Appellant Oklahoma Farm Bureau Mutual Insurance Company,

ed "[i]nsurer asserts that determining whether damage adjustments were adequately calculated depends on individualized questions of whether an insured was entitled to a payment for overhead and profit." *Melot,* 2004 OK CIV APP 25, ¶ 23, 87 P.3d 644, 648–49. While it noted the insureds' theory of insurer's across-the-board pattern of failing to pay the 20 per cent when three or more trades were involved, the *Melot* court expressly avoided making any determinations on the merits of the insureds' entitlement to the 20 per cent charge and expressly limited its determination on the issues appropriate for consideration on class certification. The substantive allegations and defenses raised in *Melot* are virtually identical to those raised here. We believe *Melot* followed the correct approach in limiting its determination to whether the trial court had abused its discretion in certifying the class, while avoiding any determination on the merits. We find *Melot* to be analogous to this case and we see no compelling reason to reach a determination at odds thereto.

### *Superiority*

▇▇▇ ¶ 20 Insurer asserts the trial court erred in its finding that a class action is superior to other available methods for the fair and efficient adjudication of this controversy. We agree with the trial court's finding that a class action is superior to other available methods, because without "class treatment, any widespread underpayment for

O & P will continue to go uncompensated or result in hundreds or thousands of individual cases." Certification Order at 17. The record includes evidence reflecting that the number of Coverage A (i.e., dwelling and attached structures used principally as a private residence) claims in Oklahoma for a five-year period ending on January 1, 2001 was 84,715.[28] If required to sue individually, Insureds would be forced to seek compensation for O & P and in each case would require the same proof regarding the existence and validity of the "three trade rule." Class action lawsuits are designed to enable plaintiffs such as Insureds here to "vindicate the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 338, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980).

¶ 21 The record reflects that alleged underpayment amounts are likely to be relatively small and therefore, most individual insureds would refrain from filing individual suit considering the relative cost of litigation.[29] Obviously, class certification is superior to individual trials in terms of judicial economy and efficiency. Without the mechanism of class certification here, some Insureds would likely remain unaware of their claims against Insurer due to the insurance contract's silence on the subject of O & P and

filed in the Supreme Court of Oklahoma, January 13, 2003 in case No. 98,242 at 8–9.

**28.** The record also includes statistics derived from Insureds' expert witnesses' analyses of 500 randomly selected claim files (for the period of January 1, 1996 through January 1, 2001), which were produced by Insurer pursuant to an agreed Order. Plaintiffs' assert that of these 500 claim files reviewed, 45% were entitled to O & P. Of those filed allegedly owed O & P, 84% were underpaid according to Insureds. When these statistics are applied to the five-year sample period, this results in an estimated number of underpaid Insureds exceeding 32,000. Insured's expert witness testified to 60,000 underpayments based upon the statistical sample. Testimony of John Robert Hunter, Transcript of Hearing of April 9, 2003, Vol. III, p. 464. The record reveals Insurer did not offer evidence to controvert the Insureds' statistical findings.

**29.** For example, the Burgess Insureds claim they were underpaid for O & P by approximately $2,000. Insurer's claim documents reflect Insurer's adjuster calculated The Burgess Insureds' ACV amount by measuring the replacement cost value at $10,999.01 less depreciation in the amount of $2,261.83. The Burgess Insureds were then offered $8,737.18 less the Insured's $500 deductible at the time of their ACV settlement. After submission of supplemental claims upon repair of the property, Insurer paid an additional $3,000, although the record reflects Burgess Insureds were never paid for O & P, which allegedly was due at the time of the ACV settlement. Plaintiffs' Exhibit # 16, claim documents regarding Burgess loss of October, 2000 prepared by claim representative David McKeown. Insureds submit that they will accept Insurer's amount of ACV and multiply that amount by 20% (or stated another way, 2 times the actual cash value settlement amount) to determine the measure of damages.

the lack of information provided to Insureds regarding Insureds' potential entitlement to payment for O & P. In the event the case becomes unmanageable, the trial court is free to de-certify the class and/or maintain the class as to certain issues or create subclasses should the need arise. *See Ysbrand v. Daimlerchrysler Corp.*, 2003 OK 17, ¶ 21, 81 P.3d 618, 627, *cert. denied*, 542 U.S. 937, 124 S.Ct. 2907, 159 L.Ed.2d 812 (2004) (citations omitted).

## III

## SUMMARY

¶ 22 In sum, we have reviewed the record before us and we find nothing in the record to convince us that the trial court abused its discretion in certifying a class here. The trial court is empowered under 12 O.S. § 2023(C)(1) to alter or amend its certification order before a decision on the merits, should circumstances warrant. Due to the Insureds' demonstration before the trial court of the satisfaction of the statutory prerequisites for certification of a class and notably, as specifically challenged on appeal, the predominance of the common questions over individual issues, this case appears to be one where class certification would result in significant savings of judicial resources. We express no opinion concerning the merits of the case and limit our holding to the determination that the trial court did not abuse its discretion in the entry of its Order Granting Plaintiffs' Motion for Class Certification.

¶ 23 Upon certiorari previously granted,

**THE OPINION OF THE COURT OF CIVIL APPEALS IS VACATED; TRIAL COURT'S ORDER CERTIFYING THE MATTER AS A CLASS ACTION AFFIRMED.**

¶ 24 WATT, C.J., LAVENDER, OPALA, EDMONDSON, COLBERT, JJ., concur.

¶ 25 WINCHESTER, V.C.J., TAYLOR, J., dissent.

¶ 26 KAUGER, J., not participating.

¶ 27 HARGRAVE, J., disqualified.